UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANN M. GERACI, | ) | CASE NO. 5:18CV2367 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| HARTFORD LIFE AND ACCIDENT | ) | MEMORANDUM OPINION & ORDER |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court are motions filed by Plaintiff Ann M. Geraci ("Plaintiff") and Defendant Hartford Life and Accident Insurance Company ("Defendant") for Judgment on the Administrative Record emanating from Plaintiff's complaint filed against Defendant pursuant to the Employee Retirement Income Security Act ("ERISA"). ECF Dkt. #1, 20, 23. For the following reasons, the Court GRANTS IN PART Plaintiff's Motion for Judgment on the Administrative Record (ECF Dkt. #20), DENIES Defendant's Motion for Judgment on the Administrative Record (ECF Dkt. #23), and ORDERS this case remanded to Defendant for full and fair review of its decision to deny long-term disability benefits to Plaintiff.

## I. PROCEDURAL HISTORY

On October 11, 2018, Plaintiff filed a complaint against Defendant alleging that Defendant violated the Employee Retirement Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., by terminating and refusing to pay Plaintiff continuing long-term disability ("LTD")benefits as required under the disability plan ("Plan") issued by Defendant to Children's Hospital Medical Center, Plaintiff's employer. ECF Dkt. #1.

1

Plaintiff was born in 1967 and worked as a dietician for Children's Hospital Medical Center from December of 2003 through March of 2015. *See* Administrative Record ("AR") at 652. She participated in her employer's Plan and applied for disability benefits under th Plan on her last day of work, which was March 24, 2015. *Id.* at 795, 815, 819. In her application for benefits, Plaintiff stated that she has a congenital form of dwarfism with degeneration of her vertebrae, stenosis, and hip pain. *Id.* at 654. She explained that she was unable to keep up with the work pace and responsibilities of the job due to pain and numerous falls, difficulty concentrating, the inability to lift or carry a laptop or charts, or to climb a stool to reach for or to stoop down to reach charts, or to sit in order to work on a chart. *Id.* On October 7, 2015, Defendant approved long term disability benefits for Plaintiff under the Plan, effective September 26, 2015. *Id*. at 283.

In its approval of benefits letter, Plaintiff was informed that:

> As of September 26, 2017 you must be Disabled from performing Any Occupation in order to remain qualified for LTD benefits. Please refer to page 23 of your LTD policy booklet, which states:
>
>> "**Any Occupation** means any occupation from which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of:
>>
>> 1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or
>>
>> 2) the Maximum Monthly Benefit."

*Id*. at 285.

On November 7, 2017, Defendant informed Plaintiff by letter that effective November 6, 2017, her LTD benefits would be terminated because she no longer met the Plan definition of Disability, which was defined in the Plan. ECF Dkt. # 26 at 191. That definition states as follows:

> **Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:

2

1) Your Occupation during the Elimination Period;

2) Your Occupation, for the 24 month(s) following the Elimination Period, as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and

3) after that, Any Occupation.

*Id*. The termination of LTD benefits letter also included the definition of "Any Occupation" as defined above. *Id.* The letter further explained:

A review of your claim shows that you became Disabled from performing Your Occupation on 3/25/2015. LTD benefits first became payable on 9/26/2015 upon completion of the benefit Elimination Period. As indicated in our letter of 4/7/2017, effective 9/26/2017 you must be considered Disabled from Any Occupation in order to continue to be eligible for LTD benefits. Based on information recently received in our office, it has been determined that you no longer meet the definition of Disability. Therefore, your LTD claim has been terminated and no benefits will be payable beyond 11/6/2017.

Our decision regarding your eligibility for LTD benefits beyond 11/6/2017 was based on policy language and all of the documents contained in your claim file, viewed as a whole, including the following specific information:

• Provider Statement of Abilities completed by Dr. Robert McLain on 7/3/2017
• Medical Records received from Dr. Robert McLain's office on 7/3/2017
• Medical Records received from Dr. Stullberg on 7/25/2017
• Medical Clinical Manager (MCM) review on 7/18/2017
• Referral for Independent Medical Evaluation (IME) on 8/10/2017
• IME completed on 9/29/2017 by Dr. Dennis Glazer
• Letter sent to Dr. Robert McLain from our MCM on 10/18/2017
• Request for IME Addendum received on 10/23/2017
• Response from Dr. Robert McLain on 11/3/2017
• Work and Education from you LTD application and Claimant Questionnaire
• Employability Analysis information completed by a Vocational Rehabilitation Clinical Case Manager on 10/30/2017

*Id.* at 192-195. Defendant further informed Plaintiff that, based upon its review of her claim file, including her work and education history, and the Employability Analysis, she could perform a number of occupations which did not exceed her functional abilities and for which she was qualified to work, including the representative occupations of Jacket Preparer, Claims Clerk II, Traffic Clerk, and Skip Tracer. *Id.* at 195. Defendant informed Plaintiff that if she disagreed with the termination

decision, she could appeal for another review of her claim, and if this review again resulted in a denial of further benefits, she could bring the instant civil action under ERISA. *Id.*

Also on November 7, 2017, Defendant noted an update to the October 30, 2017 Employability Analysis Report. ECF Dkt. #26 at 70-71. It noted that:

> In review of the IME conducted 10/23/17, RTWCM documented that the claimant can sit for up to 1 hour at a time for a total of 2 hours in an 8 hour day. This was noted in error and should have indicated that the claimant can sit for up to 1 hour at one time for a total of 8 hours per work day.
>
> Contrary to the functionality for sitting being noted in error, the EAR was still ran based on full time sedentary.
>
> Thus, the EAR does not require any adjustments to the original OASYS abilities profile. Therefore, the result of the original Employability Analysis Report remains appropriate.

*Id.*

On April 25, 2018, Plaintiff, through counsel, filed an appeal of the denial of her LTD claim with Defendant. ECF Dkt. #26 at 363. Plaintiff included additional and updated medical records and statements from her treating physicians, including the April 17, 2018 medical source statement from Dr. McLain and his treatment notes. *Id.* at 363-369. She also submitted a letter on May 1, 2018 appealing the November 6, 2017 determination. *Id.*

On June 13, 2018, Defendant made an addendum to the October 30, 2017 Employability Analysis Report. ECF Dkt. #26 at 65-66. The addendum indicated that it was based on Plaintiff's functional capabilities opined by Dr. Glazer in his independent medical examination of September 29, 2017 and the clarification response that he provided on October 23, 2017, as well as Plaintiff's education, training and work history. *Id*. at 65. The clarification letter asked Dr. Glazer whether he had recommendations for Plaintiff's fingering/handling and reaching. Id. at 485. Dr. Glazer responded that Plaintiff had limitations for grasping and pulling due to her right CMC arthoplasty

and he indicated that she could only lift or pull 2-3 pounds occasionally when in a seated position, she could use her upper extremities to reach above her shoulders in a non-load bearing capacity on an occasional basis, she could frequently use her upper extremities at desk/bench level, and she could handle, finger, and feel frequently. *Id.* He also noted that her grip strength and pinch strength was weak on the right due to the CMC joint of the thumb and she was therefore limited in her ability to perform fast-paced activities with her hands. *Id.*

Defendant thereafter applied the adjustments made by Dr. Glazer and found that the Employability Analysis Report yielded the same 47 occupations as initially yielded. ECF Dkt. #26 at 65-66. The addendum indicated that the same occupations of jacket preparer, claims clerk II, traffic clerk, and skip tracer, remained viable employment matches. Id. The addendum further noted:

> These occupations are sedentary in physical demands and it?[sic]s reasonable to assume that these occupations will allow for shifting or a change from sitting positions after 1-2 hours as needed for 10-15 minutes as the tasks do not require confinement to a particular station or work that is directly dependent on the conveyance of material and substantial duties from other workers and activities also involve periods of standing and walking. These stand/walk periods occur when the worker copies and files information, operates office machines, provides in person customer service, run errands, etc. In addition, these occupations do not require more than occasional reaching above shoulder and below the waist and they do not require power gripping/grasping, twisting and turning.
>
> As a result, these occupations are within her physical abilities and Ms. Geraci possesses the capabilities to perform these occupations with minimum training in tools and/or materials.

*Id*. at 66.

On June 19, 2018, Defendant issued Plaintiff's counsel a letter indicating that it was upholding its prior determination terminating her LTD benefits. ECF Dkt. #26 at 185-186. Defendant noted that it reviewed Plaintiff's updated medical records and reports from Dr. McLain and Dr. Reilly, her own affidavit, and the opinion of the independent medical opinion and

clarification of Dr. Ethiraj, who indicated that Plaintiff could function at 40 hours per week if strict adherence was made to the "stipulated restrictions. *Id*. at 185. Defendant acknowledged that Plaintiff applied for and was granted Disability Insurance Benefits from the Social Security Administration, but it noted that the criteria for qualifying for its LTD benefits was different than the criteria for qualifying for Disability Insurance Benefits. *Id*. Defendant indicated that it considered the social security disability determination, but that determination was not conclusive as it was only one piece of relevant evidence. *Id*. at 186. Defendant concluded that Plaintiff:

> Does not meet the Policy definition of Disability beyond 11/06/2017 as the weight of the medical information available for review doesn't support that she is precluded from performing the essential duties of a Sedentary physical demand occupation on a full-time basis beyond that date. Our review finds the representative occupations outlined in the 10/30/2017 Employability Analysis Report are reasonable and applicable. As such, the termination of your [client's claim] for LTD benefits was appropriate and must be upheld on appeal.

*Id.*

On October 11, 2018, Plaintiff filed the instant complaint in this Court contesting the termination of her disability benefits and alleging ERISA violations. ECF Dkt. #1. On December 19, 2018, the parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). ECF Dkt. #s 12, 13. On June 20, 2019, Plaintiff filed a Motion for Judgment on the Administrative Record. ECF Dkt. #20. On July 22, 2019, Defendant filed a response in opposition to Plaintiff's Motion and filed its own Motion for Judgment on the Administrative Record and supporting memorandum. ECF Dkt. #s 22, 23. Plaintiff filed a reply brief on August 2, 2019. ECF Dkt. #24. On August 15, 2019, Defendant filed the administrative record under seal. ECF Dkt. #26.

## II.    MEDICAL EVIDENCE

### A.    Treating Orthopedic Surgeon Dr. McLain

Starting from Plaintiff's original receipt of disability benefits, she presented to Dr. McLain on April 2, 2015 complaining of progressively worsening symptoms of lower extremity weakness,

imbalance, and urinary incontinence.  ECF Dkt. #26 at 719.  He noted that she was going to undergo surgery for severe stenosis, dwarfism that is associated with congenital stenosis, and progressing neurologic symptoms and claudication.  *Id.*  Dr. McLain indicated that Plaintiff's insurance company denied the procedure and he was treating her with conservative care, such as physical therapy, but it made her symptoms worse.  *Id.*  He indicated that injections offered no help and she was referred to a pain management specialist, and he determined that injections would not be beneficial.  *Id.*

Dr. McLain noted that Plaintiff reported an "alarming history of increasing falls, loss of balance, and a sense of progressive weakness in the lower extremities."  ECF Dkt. #26 at 719.  She explained that her leg pain was much more intense, she was experiencing urinary incontinence, and she was unable to maintain independent living in her home.  *Id.*  Dr. McLain confirmed that such symptoms were consistent with progression of Plaintiff's stenosis and cauda equina syndrome and this was an urgent problem requiring urgent surgery to decompress the neural elements.  *Id.*

Plaintiff's past medical history was noted, including her anxiety, glaucoma, dwarfism, arthritis, and numbness/tingling.  ECF Dkt. #26 at 719.  He indicated that Plaintiff was 47 years old, 110 pounds, and 26 inches tall.  *Id.* at 720.  Physical examination showed that standing began to generate leg symptoms for Plaintiff, her gait was impaired, and she required assistance or leaning on the wall in order to walk down the hall because of her balance problems.  *Id.* at 721.  He noted that x-rays showed severe stenosis, degenerative disc disease, and scoliosis.  *Id.*  Dr. McLain diagnosed severe stenosis of lumbar region with neurogenic claudication, progressing in intensity to an early degree of cauda equina syndrome.  *Id.*  He recommended immediate surgery as delay to this point has caused the progression.  *Id.*  He also diagnosed Plaintiff with scoliosis, but indicated that the decompression and lumbar fusion would not correct or extend the instrumentation into the scoliosis.  *Id.*  Dr. McLain also diagnosed sacroiliac joint dysfunction, which was a secondary issue at this time.  *Id.* at 722.  His surgical plan was a L3-S1 laminectomy bilateral facetectomies

foraminotomies nerve root decompression, pedicle screw instrumentation L3-S1 with Stryker instrumentation, using short pedicle screw fixation and local autograft bone for fusion. *Id.*

On April 7, 2015, Plaintiff underwent a L2 to S1 laminectomy with facetectomy, foraminotomies, and nerve root, cauda equina decompression, L2 to S1 pedicle screw instrumentation, L2 to S1 posterior spinal instrumentation and local autograft bone graft harvest by Dr. McLain. ECF Dkt. #26 at 449. Her diagnoses were listed as L4-L5 spondylolisthesis, L3, L4, L5 spinal stenosis with nerve root impingement, cauda equina syndrome, incipient, scoliosis, degenerative disc disease, and dwarfism. *Id.* On a follow-up visit dated July 23, 2015, Plaintiff presented to Dr. McLain complaining of low back, and right buttock and thigh pain. *Id.* at 436. She reported that she still has persistent back and buttock pain, numbness and tingling in her thighs into her feet, leg pain when she walked, and her spinal balance was not changed from the surgery. *Id.* Upon review of x-rays, Dr. McLain noted a significant takeoff to the left of the lumbosacral junction, but the instrumentation placed during the surgery was in satisfactory alignment and the fusion appeared to be incorporating. *Id.* at 437.

Dr. McLain indicated that Plaintiff was making reasonable progress at three months for someone who was recovering from a lumbosacral instrumented fusion with extensive decompression for severe stenosis and spinal stenosis in a dwarf. ECF Dkt. #26 at 437. He noted that her spinal anatomy was somewhat atypical. *Id.* He further indicated that the decompression was wide and complete and no evidence of residual compression was observed, but Plaintiff still had radicular symptoms that were impairing her function. *Id.* He referred her to physical therapy and told her to increase her activity. *Id.*

A CT scan of the lumbar spine dated November 16, 2015 indicated a severe levoconvex scoliotic curve of the lumbar spine, grade 1 spondylolisthesis at L4-L5, the previous laminectomies, degenerative narrowing of the discs at T11-12 and T12-L1, with slight retrolisthesis at T12-L1, and loss of foraminal height in the concavity of the scoliotic curve resulting in considering crowding of

the right neural foramen.  ECF Dkt. #26 at 426.

Plaintiff returned to Dr. McLain on December 10, 2015 complaining of persistent progressive low back pain with radiation to the thigh into the midfoot on the right side.  ECF Dkt. #26 at 419.  She indicated that she suffered from sharp and stabbing back pain with range of motion and persistent and severe leg pain with range of motion, twisting, bending, and flexion.  *Id.*  She described her ability to function as very limited, she could not walk distances, and she could not flex her hip or rotate her foot to put on her socks and shoes.  *Id*.  Physical examination showed that she had focal back pain at the lumbosacral junction with aggravated pain with forward flexion.  *Id.* at 420.  She required help to move up and back and forward flexion was limited to 50 degrees.  *Id.*  X-rays showed pseudoarthrosis after fusion or arthrodesis at L5-S1 and this was diagnosed, as well as spinal stenosis of lumbar region with neuogenic claudication, and scoliosis.  *Id*.  An anterior interbody fusion through a retroperitoneal approach was recommended to stabilize Plaintiff's lumbar spine.  *Id*. at 421.

A March 10, 2016 x-ray of Plaintiff's lumbar spine showed severe levoconvex scoliosis of the lumbar spine with its apex at the L2-L3 level, a prior fusion from L3-S1 with pedicle screws transfixed by rods, the laminectomy extending from interior L4-S1, a prior L5-S1 fusion, and grade 1 spondylolisthesis of L4-L5 that did not change with flexion or extension.  ECF Dkt. #26 at 410.  The x-ray also noted severe degenerative disc narrowing at the L1 and L2 levels especially in the concavity of the scoliotic curve to the right.  *Id.*

April 21, 2016 treatment notes from Dr. McLain indicate that Plaintiff was 3 months post-status a lift for L5-S1 pseudoarthrosis.  ECF Dkt. #26 at 405.  He noted that Plaintiff reported still having paraspinous muscular pain and difficulty due to her deformity.  *Id.*  Plaintiff indicated that she felt that she had shifted off to one side and sometimes she slouched to the side and cannot stand up straight.  *Id.*  Dr. McLain diagnosed Plaintiff with right hip pain and noted that she was in the midst of a work-up for this.  *Id*. at 407.  He also diagnosed Plaintiff with pseudarthrosis after fusion

or arthrodesis and scoliotic deformity that was well balanced with Plaintiff in her best position, but the oblique takeoff at the lumbosacral junction posterior and an awkward mechanical position most of the time. *Id*. Dr. McLain indicated that Plaintiff may require a L4 osteotomy and more extensive scoliotic reconstruction to stabilize her spine and provide her with better balance. *Id*. He further noted that Plaintiff still had episodes of neuropathic pain and dysesthesias distally from spinal stenosis of her lumbar region and neurogenic claudication, but her cauda equina compression was well relieved by her laminectomy. *Id*.

December 20, 2016 x-rays ordered by Dr. Stulberg showed that Plaintiff had a pelvic deformity due to her short stature, with slowly progressive medial osteoarthritic involvement of the right hip joint, consistent with inflammatory medial osteoarthritis. ECF Dkt. #26 at 1035. Incidentally noted was evidence of spinal arthrodesis of the lower lumbar spine to the sacrum. *Id.*

On March 30, 2017, Dr. Stulberg performed a right hip arthroplasty on Plaintiff due to her dwarfism with right hip dysplasia and secondary degenerative joint disease. ECF Dkt. #26 at 1045.

On June 22, 2017, Plaintiff followed up with Dr. McLain for her radiculopathy. ECF Dkt. #26 at 395. He noted that Plaintiff returned to him for her lumbar spine and "complex scoliotic deformity" after quite some time. *Id*. He indicated that Plaintiff had undergone a right total hip replacement and her gait imbalance had improved significantly. *Id*. However, Plaintiff still reported back pain, her spine locking up when she moved inadvertently, and problems compensating for her decompensated lumbosacral takeoff. *Id.*

Dr. McLain related that Plaintiff had a "complicated course" following her original surgery for congenital spinal stenosis, as she required an anterior interbody fusion and posterior lumbar instrumentation and fusion. ECF Dkt. #26 at 395. He indicated that Plaintiff had a herniation through her anterior abdominal approach which was repaired with a mesh graft, but she still complained of back pain and further misalignment of her upper thoracic spine. *Id*. Dr. McLain noted that Plaintiff was apprehensive about further surgeries, but she was also concerned because

she was being asked to return to work even though she is clearly debilitated and impairment by her spine and hip problems.  *Id.*  Plaintiff reported that she was working with her primary care physician regarding disability evaluation.  *Id.*

Physical examination showed little change from the last examination.  ECF Dkt. #26 at 397. Dr. McLain noted that Plaintiff compensated well as far as her stance and balance were concerned, and she maintained sagittal and coronal balance when standing and moving.  *Id.*  However, he indicated that Plaintiff was very stiff and movements such as twisting or bending brought on significant muscle spasms, she was tender to palpation over the lumbosacral joint, and the obliquity of her lumbar takeoff caused a sharp compensatory curve in her thoracic spine.  *Id.*  He found that Plaintiff's range of motion was difficult due to her joint problems and her strength was impaired due to her lumbar and pelvic girdle pain and her postsurgical status.  *Id.*  X-rays showed stable but asymmetric reconstruction at L3-S1, and a solid fusion at L5-S1.  *Id.*  He indicated that the oblique takeoff would require an aggressive osteotomy at L3-4 or 4-5 level in order to obtain a straighter spine, and fusion from the mid-thoracic level to the sacrum would be necessary to balance and hold the spine in position.  *Id.*  Dr. McLain opined that the surgical risks would be significant and Plaintiff was not ready to do it at that time because she was recovering from her total hip replacement.  *Id.* at 398.  He indicated that he would have her continue physical therapy, but he did not think that focal physical therapy would provide her much benefit.  *Id.*

Dr. McLain also opined that "[w]ith respect to her lumbar spine, her scoliosis, thoracic spine, and her other problems, I do not see how she will be able to return to light to moderate duties without restriction, and I do not think that there is much chance she can return to her work environment successfully."  ECF Dkt. #26 at 398.  He further indicated that he encouraged her to get a disability evaluation from her primary care doctor and "[w]ith respect to her lumbar spine, I would not release her to any job that required repetitive lifting, and she would need to go back to a job that allowed her to rest whenever she needed to, without structured hours.*"  Id.*  He indicated

that Plaintiff's back pain and deformity were persistent and unlikely to be corrected or completely resolved by any surgical procedure. *Id.* Dr. McLain further opined that:

> At this point I do not see that the patient can get back to light to moderate activities on any routine basis, but I would encourage her to continue activities as tolerated, including light lifting and daily walking exercises for back and total conditioning. Just from the standpoint of her lumbar spine and her congenital deformities, I do not see her returning to gainful employment on a full-time basis.

*Id.*

An imaging report for Plaintiff's cervical spine showed mild to moderate multilevel degenerative disc height loss, multilevel facet arthropathy, and trace anterolisthesis at C5-C6 and C6-C7, with no instability on flexion or extension. ECF Dkt. #26 at 391. A lumbar spine report for the same date showed the fusion hardware at L5-S1 unchanged, but severe degenerative changes, and unchanged levoscoliosis centered at L2-L3, unchanged grade 1 anterolisthesis at L4-L5, with no instability. *Id.* at 393.

November 2, 2017 treatment notes from Dr. McLain indicated that Plaintiff presented for follow-up for her back pain with radiculopathy. EC Dkt. #26 at 385. She also reported grating and pain in her neck. *Id.* Dr. McLain noted that Plaintiff continued to do "reasonably well" after her hip arthroplasty, but her low back was still painful and she complained of bilateral lower extremity numbness and pain. *Id.* She had reported falling the week prior due to leg weakness and she reported neck pain when she was active, as well as hand numbness and tingling. *Id.* Physical examination showed full neck range of motion and normal cervical posture, but paraspinous and parascapular muscular pain with flexion and extension and with right and left rotation. *Id.* at 387. Dr. McLain's examination of Plaintiff's back was unchanged and Plaintiff reported groin and hip pain, but much less than before her hip surgery. *Id.* He indicated that Plaintiff could stand and walk with reasonably good balance, but "this was compromised by her multiple musculoskeletal abnormalities and her scoliosis." *Id.* He noted that Plaintiff used a cane in her left hand and her spine was tender to palpation. *Id.*

Dr. McClain indicated that Plaintiff's cervical spine x-rays showed mild degenerative changes at multiples levels of the cervical spine with facet arthrosis, a 2 mm anterolisthesis of C5 on C6 and a 3-4 mm anterolisthesis of C6 on C7, but overall satisfactory alignment. ECF Dkt. #26 at 387. He also noted that Plaintiff's lumbar x-rays showed progressive deterioration of the L2-L3 disc above her prior lumbar incision, with a pedicle screw at L3 protruding above the endplate. *Id.* at 388. He explained that Plaintiff's severe oblique takeoff at the lumbosacral junction always left her with a significant if compensated lumbar scoliosis. *Id.* He diagnosed Plaintiff with neck pain, unchanged, and indicated that if her symptoms persisted, she should start physical therapy. *Id.* Dr. McLain also diagnosed scoliosis and indicated that Plaintiff's "congenital abnormalities and her severe scoliosis continued to compromise function and contribute to her pain. The operated levels appear solidly fused now, but the chronic obliquity of the lumbosacral junction puts her lumbar spine in an awkward alignment. Her persistent leg symptoms are concerning for adjacent level stenosis, patient is not ready to consider surgery at this point. *Id.* Dr. McLain noted that Plaintiff had an appointment for pain management and she should restart physical therapy. *Id.* at 389. He further noted that once Plaintiff dealt with her glaucoma issues and was able to start pain management, she may want to consider additional surgery for her lumbosacral and thoracolumbar scoliosis. *Id.*

On December 27, 2017, a scoliosis spine survey showed mild levoscoliosis of the lumbar spine, postsurgical changes of posterior lumbar spine fusion at L3 through S1, anterior lumbar spin fusion at L5-S1, subtle pelvic tilt and bronchial shift to the left, and total right hip replacement. ECF Dkt. #26 at 379.

February 15, 2018 treatment notes from Dr. McLain indicate that Plaintiff followed up with him for her severe multiple musculoskeletal problems. ECF Dkt. #26 at 381. He noted that she still had significant low back, buttock and hip pain, and was now complaining of neck pain and left arm

pain symptoms associated with neck problems. *Id*. He indicated that while Plaintiff was doing better status post hip replacement, she still had significant back problems*. Id*. He explained that Plaintiff did not have the severe radiculopathy or the cauda equina symptoms she had prior to her lumbar decompression and fusion, but her back pain and imbalance were still big problems. *Id*.

Dr. McLain further noted that lumbar x-rays showed a solid fusion of the lumbosacral spine, but "the acute takeoff at the lumbosacral junction, and the compensatory curve at the thoracolumbar junction put her [at] significant sagittal and coronal imbalance. She is off midline by several centimeters at the thoracic spine level." *Id*. at 382. He explained that correcting this deformity would require "extensive anterior and posterior osteotomies a[nd] reconstruction but the significant risk and measurable risk of mortality posed by the correction outweighed the correction and would not completely relieve Plaintiff's back pain or the other issues that she had with her peripheral joints and hips in any event." *Id.*

Dr. McLain outlined Plaintiff's three medical issues of concern and set forth his recommendations. ECF Dkt. #26 at 382. He identified spinal stenosis of lumbar region with neurogenic claudication and noted that Plaintiff's wide decompression and fusion had improved her severe stenosis and claudication. *Id*. However, he indicated that Plaintiff's scoliosis, segmental instability, and back pain were not relieved, conditions which were due to her scoliosis and deformity, and which are aggravated by her dwarfism and age-related degeneration. *Id*. He concluded:

> At this point the patient's multiple musculoskeletal problems believe her capable of self-care at home, but incapable of ambulation without assistance. Already at a disadvantage because of her stature, finding a suitable workstation for even sitting and desk work would be difficult, and prolonged sitting is impossible because of her multiple musculoskeletal problems.

*Id*. He recommended further evaluation of her ongoing cervical symptoms in the future, and noted that Plaintiff may require lumbar spine surgery in the future. *Id*.

As to her second problem, Dr. McLain identified cervical spondylosis with radiculopathy and noted that a MRI was necessary in order to determine if surgery or medical management was necessary. ECF DKt. #26 at 382. He ordered a cervical MRI and referred Plaintiff to pain management. *Id.* at 383.

Dr. McLain identified Plaintiff's third problem as scoliosis and indicated that it was unchanged. ECF DKt. #26 at 383. He ordered a lumbar spine x-ray. *Id.*

In the conclusory part of his notes, Dr. McLain indicated that Plaintiff continued to struggle with her "disability issues, and I recommended that she get an advocate in case litigation is necessary. I have agreed with the IME physician who found her totally disabled, and I have not met many patients in my career who would be more reasonably considered totally disabled from gainful employment or physical activity." ECF DKt. #26 at 383.

On April 17, 2018, Dr. McLain completed a medical source statement indicating that his specialty was orthopedics and spine surgery and he had treated Plaintiff multiple times over the past 3 years. ECF DKt. #26 at 367. Dr. McLain indicated Plaintiff's diagnoses as lumbar scoliosis, lumbar stenosis, cauda equina compression, and dwarfism. *Id.* His prognosis for her was fair for function and pain control, and he noted her symptoms of back and leg pain with weakness and thoracolumbar deformity. *Id.* He opined that Plaintiff would experience good and bad days, but he did not opine how often she would have to be absent from work if she was trying to work on a full-time basis. *Id.* He further opined that Plaintiff could: walk less than one city block without resting; sit for 2 hours at one time before needing to get up; stand for 30 minutes at a time before needing to sit or walk around; sit and stand/walk for 2 hours each in an 8-hour day with normal breaks; needed a job that allows shifting positions at will from sitting, standing or walking; would need to take unscheduled breaks as needed during a workday; could occasionally lift and carry less than 10 pounds, rarely lift and carry 10 pounds and never lift and carry 20 pounds or 50 pounds; rarely twist or climb stairs, and never stoop, crouch/squat, or climb ladders; grasp, turn and twist objects 100%

15

of the time with her right and left hands, but reach in front of her body only 20% of the time with both hands, fingers, or arms, and reach overhead only 10% of the time. *Id*. at 368-369. Dr. McLain concluded:

> Pt functions with a number of impairments associated with her dwarfism, and copes with musculoskeletal disorders associated with her primary condition. In addition she developed severe spinal deformity, stenosis and cauda equina compression that further curtails function and caused pain. Finally, Pt has undergone extensive spinal surgery to care for cauda equina compression and stabilize lumbar spine, which results in further and permanent impairment.

*Id.* at 369.

### B.    Orthopedic Hand Surgeon Dr. Reilly

On April 11, 2018, Dr. Reilly of the Crystal Clinic Orthopaedic Center evaluated Plaintiff for her left thumb and right elbow pain. ECF Dkt. #26 at 370. He noted her complaints of continuous sharp pain in her left thumb and right elbow that increased with activity, along with intermittent numbness and tingling in all of her fingers and in her hand. *Id*. Plaintiff had also told Dr. Reilly that she had fallen more than once in the past year with resulting injury. *Id.* Plaintiff also complained of arthritis pain and swelling all over, ankle swelling, leg swelling, left hand and right elbow pain, double vision, difficulty sleeping, and cold intolerance. *Id.* at 371. He indicated that Plaintiff's height was 4 feet and her weight was 123 pounds. *Id.* Upon examination and x-rays, Dr. Reilly diagnosed Plaintiff with localized primary osteoarthritis of carpometacarpal joint of the left thumb and right elbow. *Id*. at 373. He noted that Plaintiff had a previous arthroplasty of the carpometacarpal joint of the right hand and had done well, and he was going to splint her right arm and schedule a possible injection in her left thumb carpometacarpal joint at the next visit. *Id*.

On the same date, Dr. Reilly completed portions of a medical source statement in which he opined that Plaintiff could grasp, turn and twist objects 30% of an 8-hour workday with her right hand/fingers/arm and 0% on the left, she could perform fine finger manipulations 40% of the workday with her right fingers and 20% with her left, and Plaintiff could reach in front of her body

and overhead on the right 10% of the workday and 30% on the left.  ECF Dkt. #26 at 378.  He predicted that Plaintiff would be off-task 25% or more of a workday and when asked about her ability to sustain an 8-hour workday, days per week, Dr. Reilly wrote:

> Left thumb arthritis - limiting ability to pinch
>
> Right thumb s/p arthritis surgery reconstruction better than left but still not strong
>
> right elbow arthritis incomplete extension, pain.

*Id*.

### C.      Independent Medical Examiner Dr. Glazer

On September 29, 2017, Defendant requested that Dr. Glazer perform an independent medical examination of Plaintiff.  ECF Dkt. #26 at 488.  Dr. Glazer reviewed Plaintiff's medical history starting with her chondral form of dwarfism, scoliosis, and the numbness in her legs and spinal problems that began in 2013 and 2014.  *Id*.  He indicated that Plaintiff had a spinal decompression at the thoracolumbar junction to S1 with rods and screws on April 20, 2015 and a L5 anterior discectomy surgery with bone graft and cages in February 2016.  *Id*.  Dr. Glazer noted that Plaintiff suffered an abdominal hernia following the procedure and had a hernia repair on November 20, 2016.  *Id*.  He noted her right total hip replacement on March 30, 2017 followed by physical therapy, and her glaucoma, for which she was taking medication.  *Id*. at 489.  He further noted her right carpal tunnel surgery, a right CMC interposition arthroplasty, her cataract surgeries, 2 c-sections, and hypertension.  *Id.*  He also indicated a left knee injury where Plaintiff's knee locks up and does not bend.  *Id*.

Dr. Glazer observed that Plaintiff had a slow, wide-based gait and was using a cane in her right hand, as she reported that her left knee gives out.  ECF Dkt. #26 at 490.  Upon physical examination, he noted a bilateral tibial torsion with bowing of both knees, no bending at the waist, no lateral bending of her spine and still had a residual scoliosis that is apparent.  *Id*.  Dr. Glazer indicated that Plaintiff's back was diffusely tender to palpation, decreased sensation in both feet,

negative straight leg raising, generally diminished deep tendon reflexes, normal motor strength in the lower extremities, slightly diminished grip and pinch strength in the upper extremities, negative Tinel's sign and full range of motion. *Id.*

Dr. Glazer listed the records that he reviewed, including x-rays, Dr. McLain's treatment notes, Dr. Stulberg's surgery notes, primary care physician Dr. Pinto's notes, and Defendant's records. ECF Dkt. #26 at 492. Based upon a reasonable degree of medical certainty and probability, Dr. Glazer opined that Plaintiff could sit for up to 1 hour at a time for 8 hours per workday, stand and walk for 20 minutes at a time each per 8-hour workday, lift/push/pull 2 or 3 pounds occasionally, must use a cane for ambulation, and she cannot bend, stoop, crawl, or climb. *Id.* at 493. He further opined that Plaintiff had limitations in grasping and pulling because of her right CMC arthroplasty and can only lift or pull 2-3 pounds occasionally when in a seated position, and she had limited grip strength and weak pinch strength on the right. *Id.* He agreed that Plaintiff's complaints and findings were consistent with her observed behavior and the findings of his examination and the medical records. *Id.* Dr. Glazer further opined that his prognosis for Plaintiff was guarded because her condition was permanent and her spinal problems are typically incurred with dwarfism, and functional improvement was unlikely beyond her current level. *Id.* He indicated that she had impairment for functional activities including dressing and ambulation which were unlikely to change. *Id.* at 493-494.

### D. File Reviewing Physician Dr. Ethiraj

On June 6, 2018, Dr. Ethiraj reviewed Plaintiff's medical file at the request of Defendant in order to provide an opinion on her ability to sustain full time work, her physical limitations and restrictions, and any functional side effects and impairments from her medications from November 7, 2017 onward. ECF Dkt. #26 at 342. He noted that Plaintiff was 50 years old, and stopped working on March 25, 2015 due to a lumbar spine complex scoliotic deformity, status post total hip replacement and osteoarthritis in the left thumb and elbow. *Id.* Dr. Ethiraj also indicated that he was

told to contact Plaintiff's treating physicians, Drs. McLain and Reilly, and discuss with them Plaintiff's conditions, symptoms, limitations, restrictions, abilities, and supporting findings. *Id.* at 343. Dr. Ethiraj also outlined the documents that he reviewed in making his assessment, which included cervical and lumbar spine x-rays and CT scans, hip and upper extremity x-rays, lab reports, treating physician reports, emergency room visits, and a determination letter from social security. *Id.* at 343.

Upon review of her medical history and records, Dr. Ethiraj determined that as of November 7, 2017, Plaintiff could stand and walk for 15-20 minutes at a time for a total of 1-3 hours in an 8-hour workday; she could sit for 1-2 hours at a time with frequent breaks of 10-15 minutes as needed every 1-2 hours for shifting or to change positions; she was limited to lifting, carrying, pushing and pulling less than 5 pounds using any one hand and limited to 5-10 pounds using both hands; she could not climb stairs or ladders, crawl, kneel, crouch, balance, work at unprotected heights or operate heavy machinery; she could reach at desk level on frequent and above shoulder and below waist on an occasional level; and she could frequently use her hands for simple gasping, fingering and manipulation, but not for power gripping or grasping, twisting and turning. ECF Dkt. #26 at 353. He opined that no evidence barred Plaintiff from working 40 hours per week "provided strict adherence to the stipulation restrictions" that he opined. *Id.* Dr. Ethiraj further explained that most of Plaintiff's medical providers agreed with his restrictions and they clarified their differences of opinion on the duration of Plaintiff's ability to tolerate sitting. *Id.* at 354.

### III.    LAW AND ANALYSIS

In evaluating Defendant's decision, the parties agree that this Court's standard of review of the decision is to determine whether Defendant's denial was arbitrary and capricious. ECF Dkt. #s 20 at 17, #23 at 19. A court applies a *de novo* standard in reviewing a plan administrator's decision to deny ERISA benefits, unless the benefit plan confers discretionary authority to the plan administrator to determine eligibility of benefits and construe plan terms. *See Firestone Tire &*

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the benefit plan expressly and clearly grants discretionary authority, the court does not conduct a *de novo* review, but rather determines whether the plan administrator's decision was arbitrary and capricious. *Id.* Neither party disputes that the instant Plan confers express discretionary authority to Defendant as the Plan contains a specific provision entitled "Claims Procedures" which specifically states that "[t]he Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." ECF Dkt. #26 at 52. Therefore, the Court must determine whether Defendant's decision to terminate Plaintiff's disability benefits after the first twenty-four months of entitlement was arbitrary and capricious.

"A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by 'substantial evidence.'" *McLain v. Eaton Corp. Disability Plan,* 740 F.3d 1059, 1064-1065 (6th Cir. 2014), quoting *Schwalm v. Guardian Life Ins. Co*, 626 F.3d 299, 308 (6th Cir.2010). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McLain*, 740 F.3d at 1065, citing *Shields v. Reader's Digest Ass'n, Inc*., 331 F.3d 536, 541 (6th Cir. 2003)(quoting *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989). It is not the province of this Court to substitute its judgment for that of the claim reviewer in reviewing Defendant's decision under the arbitrary and capricious standard of review. *Brown v. National City Corp*., 974 F.Supp.1037, 1042-1043 (W.D. Ky. 1997), *aff'd.*, 166 F.3d 1213 (6th Cir. 1998). However, this standard of review is not just a "rubber stamp" by the Court. *Moon v. Unum Provident Corp*., 405 F.3d 373, 379 (6th Cir. 2005). This requires the Court to review "the quality and quantity of the evidence, mindful that the plan administrator's decision should be upheld if it is the result of a deliberate, principled reasoning process and supported by substantial evidence." *Hayden v. Martin Marietta Mats., Inc. Flexible Benefits Prog*., 763 F.3d 598, 605, citing *DeLisle v. Sun Life Assurance Co. of Can.,* 558 F.3d 440, 444 (6th Cir. 2009).

Plaintiff asserts that this Court should consider as one factor to review that Defendant was acting under a conflict of interest or potential conflict in making its determination because it acted as both administrator and payor of the claim. ECF Dkt. #20 at 18, citing *MetLife Ins. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). The Court notes that the Sixth Circuit has held that "[t]he existence of a conflict of interest shapes the application of, but does not change, the 'arbitrary and capricious' standard of review." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir.1991)(citing *Brown v. Blue Cross & Blue Shield of Alabama,* 898 F.2d 1556, 1561-63 (11th Cir.1990)). Defendant points out that Plaintiff has presented no allegations of bias and that her mere allegations of the existence of a conflict of interest are insufficient to show that the denial of her claim was arbitrary. ECF Dkt. #22 at 19, *citing Judge v. Metro Life Ins*., 710 F.3d 651, 664 (6th Cir. 2013). Defendant is correct and therefore, Plaintiff must present some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits. *Id*. The Court finds that Plaintiff offers no such evidence in this case and therefore the Court shall not consider such a factor.

In any event, Plaintiff asserts that Defendant's decision terminating her long-term disability benefits was arbitrary and capricious. She first cites to the opinions of her treating orthopedic surgeons, Dr. McLain and Dr. Reilly, and argues that while Defendant was not required to afford special deference to their opinions, it could not arbitrarily reject or refuse to consider them. ECF Dkt. #20 at 18-19, citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

"In reviewing medical evidence in an ERISA case, courts may not conclude that the opinion of treating physicians is entitled to more weight than that of non-treating physicians." *Bruton v. Am. United Life. Ins. Corp*., No. 19-3466, ---Fed. App'x ---, 2020 WL 398539, at *8 (6th Cir. Jan. 23, 2020). However,

> ERISA does not grant to a plan administrator carte blanche to adopt the opinions of its reviewing physicians. When a reviewing physician's report is "inadequate," a plan administrator cannot be said to engage in a deliberate, principled reasoning process when it adopts the position of that report. *Kalish [v. Liberty Mut./Liberty Life*

> *Assurance Co. of Boston*], 419 F.3d 501, 509–511 [(6ᵗʰ Cir. 2005)]. In particular,
> where a reviewing physician's opinion applies standards that conflict with the terms
> of the plan, that opinion is not evidence supporting a conclusion that the claimant is
> not disabled within the meaning of the plan. *See id.*; *Elliott v. Metro. Life Ins. Co.*,
> 473 F.3d 613, 619–20 (6th Cir.2006). [footnote omitted]

*Hayden*, 763 F.3d at 607.

The Court finds that Defendant in this case did consider the opinions of Drs. McLain and Reilly. In fact, it specifically noted that it had reviewed their statements and records in its November 7, 2017 letter to Plaintiff informing her that she no longer met the definition of "Disabled" as defined by the Plan. Defendant indicated that it received Dr. McLain's medical records and his statement of abilities for Plaintiff dated July 3, 2017 in which he indicated that she was not released for work. ECF Dkt. #26 at 194. Defendant noted that it then sent Plaintiff for the independent medical examination with Dr. Glazer, who found on October 13, 2017 that Plaintiff could work with restrictions and limitations. *Id.* Defendant informed Plaintiff in the letter that it faxed a letter to Dr. McLain on October 18, 2017 along with the results of Dr. Glazer's examination and findings. *Id.* Defendant continued that Dr. McLain advised that he agreed with the results of Dr. Glazer. ECF Dkt. #26 at 194.

However, Defendant later indicated in its Summary Detail Report comments that, "Upon appeal medical information has been provided indicating that Dr. McLains[sic] opinion of Ms. Geraci?[sic]s functional abilities has been altered even noting in the 2/15/18 office visit note that the IME physician found Ms. Geraci to be totally disabled noting that he also agreed with this. It appears that there may be a misunderstanding of the IME physician?s[sic] opinion of Ms. Geraci?s[sic] functionality." ECF Dkt. #26 at 62.

Defendant thereafter sent Plaintiff's claim file and medical records for an independent medical records review with the specific request that the reviewer comment on Plaintiff's functionality from 11/06/2017 and her ability to work on a consistent basis. ECF Dkt. #26 at 63. The reviewer was Dr. Ethiraj, who indicated that he spoke to Dr. McLain and Dr. Reilly. *Id.* The

Summary Detail Report indicates that Dr. Ethiraj opined that Plaintiff had significant musculoskeletal abnormalities and physical impairments that impacted her functionality. *Id*. The Report further indicates that Dr. Ethiraj restricted Plaintiff to jobs where she could "sit **up to** 1-2 hours at a time **with frequent breaks** of 10-15 minutes **as needed every 1-2 hours** for shifting or change of position." *Id.*[emphasis added]. He indicated that in his telephonic conference with Dr. McLain, Dr. McLain again opined that Plaintiff was totally disabled by her medical conditions, but acknowledged that impairment and disability assessment are not within his scope. *Id*. at 344. Nevertheless, according to Dr. Ethiraj, they both "agreed that [Plaintiff] can sit frequently with 10-15 minute breaks every 1-2 hours while sitting." *Id*. at 344. Dr. Ethiraj opined that "there is no evidence to preclude her from functioning at 40 hours a week provided strict adherence to the stipulated restrictions." *Id*.

In its June 19, 2018 comprehensive appeal review decision, Defendant informed Plaintiff that the documentation supported its prior decision. ECF Dkt. #26 at 184. It specifically quoted Dr. Ethiraj's opinion, among his limitations, that Plaintiff "can sit up to 1-2 hours at a time with frequent breaks of 10-15 minutes as needed every 1-2 hours for shifting or change of position." *Id*. at 185. Defendant concluded that the weight of evidence did not support that Plaintiff was "precluded from performing the essential duties of a Sedentary physical demand occupation on a full-time basis beyond that date. Our review finds that the representative occupations outlined in the 10/30/2017 Employability Analysis Report are reasonable and applicable." *Id*. at 186.

However, in its Summary Detail Report, Defendant's examiner indicated that it was reasonable to assume that the representative occupations of jacket preparer, claims clerk II, traffic clerk, and skip tracer "will allow for a shifting or a change from sitting position **after 1-2 hours** as needed **for 10-15** minutes as the tasks do not require confinement to a particular station or work that is directly dependent on the conveyance of material and substantial duties from other workers and activities also involve periods of standing and walking." ECF Dkt. #26 at 64.

This sitting limitation set forth by Defendant's examiner in the Summary Detail Report and relied upon in making the disability determination is different than that opined by Dr. Ethiraj and allegedly agreed to by Dr. McLain. ECF Dkt. #26 at 64, 185, 353. The former allows for a change in sitting **after** 1-2 hours with a 10-15 minute break thereafter, while the latter allows for breaks **while sitting during** the 1-2 hours. Without analysis of whether this distinction makes a difference in the ability to perform sedentary work and Plaintiff's ability to perform such work, is unknown. Accordingly, the Court cannot find that Defendant's decision to terminate Plaintiff's long-term disability benefits is supported by substantial evidence.

In addition, the Court is concerned about Plaintiff's pain tolerance and whether it was properly considered, as Dr. McLain informed Dr. Ethiraj that Plaintiff was limited by the persistent pain from her spinal dysfunction caused by her underlying back deformity. ECF Dkt. #26 at 344. Dr. Ethiraj noted in his report that "[t]he review of the medical records and the discussion with the attending physicians revealed significant musculoskeletal abnormalities and physical impairments impacting her functionality in all domains both based on risk, lack of capacity and tolerance due to pain that was credible due to the underlying conditions detailed above." *Id*. at 352. Dr. Glazer also found that Plaintiff's complaints and findings were consistent with her observed behavior and with the findings on his examination. *Id*. at 493. Plaintiff had reported to him that her back hurt nonstop and it was a sharp pain, making it hard to stand, and she used an assistive device to help her get dressed and used a cane. *Id.* at 489. Dr. McLain had opined that even with the spinal surgeries, Plaintiff's scoliosis, segmental instability, and her back pain were not relieved as those conditions were due to her scoliosis and deformity, which were aggravated by her dwarfism and age-related degeneration. *Id.* at 382.

Moreover, nowhere in Defendant's analysis of Plaintiff's ability to perform sedentary work is her limitation to using a cane for ambulation. Dr. Glazer specifically referenced that Plaintiff had a slow, wide-based gait and used a cane at all times. ECF Dkt. #26 at 489-490. In determining her

restrictions and limitations, Dr. Glazer opined, among other limitations, that Plaintiff "is limited with her ambulation and uses a cane for ambulation." *Id*. at 493. Dr. Ethiraj also indicated in his opinion that Plaintiff was limited and restricted based, among other conditions, by the "[c]onsistent use of cane and wide based gait on ambulation." *Id*. at 353.

For these reasons, the Court GRANTS Plaintiff's Motion for Judgment on the Administrative Record IN PART (ECF Dkt. #20) and DENIES Defendant's Motion for Judgment on the Administrative Record (ECF Dkt. #23).

The remaining issue is the "question of remedy." *Hayden*, 763 F.3d at 609. Remanding the case to a plan administrator is proper "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Hayden,* 763 F.3d at 609, quoting *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir.2007) (quoting *Elliott v. Metropolitan Life Ins. Co.* 473 F.3d 613, 622 (6th Cir. 2006)). "But '[p]lan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits. They need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable.'" *Hayden*, 763 F.3d at 609, quoting *Cooper*, 486 F.3d at 172. While the Court remands the instant case primarily because of procedural problems in the plan's decision-making process, Defendant is advised upon remand to closely review Dr. McLain's opinions and examine whether those opinions changed upon speaking with Dr. Ethiraj, as Dr. McLain's opinions appeared to remain consistent throughout his treatment with Plaintiff.

## IV.    CONCLUSION

For the above reasons, the Court GRANTS IN PART Plaintiff's Motion for Judgment on the Administrative Record (ECK Dkt. #20) and DENIES Defendant's Motion for Judgment on the

Administrative Record (ECF Dkt. #23).  The Court ORDERS this case remanded to Defendant for full and fair review of its decision to deny Plaintiff long-term disability benefits under its Plan.

IT IS SO ORDERED.


1/31/2020                                     */s/George J. Limbert*
Date                                          GEORGE J. LIMBERT
                                                      U.S. MAGISTRATE JUDGE